## CROW *v.* MYERS *et al.*

*(District Court, E. D. Virginia.* February 19, 1890.)

SHIPPING—CHARTER-PARTY—CANCELLATION—READINESS TO LOAD.

A charter-party provided that the vessel chartered should, "with all convenient speed, sail and proceed" to certain ports, and there load a certain cargo, "and, having so loaded, proceed direct, under steam, to Liverpool. * * * The entire carrying capacity, including cross-bunkers, space under bridge deck, lazarette, deck-houses, and other spaces where steamer has usually carried cargo, or would carry cargo if loaded on rates, shall be placed at the disposal of charterers, exclusive of any space which may be needed for the crew, cabin stores, and coal for the voyage. * * * If no heavy cargo be shipped, and additional ballast be required, the same to be provided by the steamer." It also provided that the charter should not commence "until the morning after the steamer is ready to receive cargo at the place of loading, all of her holds being cleared and passed for grain, and customary notice thereof given to the charterers or their agent; and such notice must be given before 12 o'clock of the day that the steamer is ready. * * * Should the steamer not be ready in all respects for cargo, at her first loading port for entering on this charter, by December 25, 1888, the charterers may cancel the charter." Under this charter the vessel arrived at one of the loading ports, and gave notice of readiness on Saturday, December 22d, after 12 o'clock, which the charterers declined to receive. The notice was repeated on Monday, the 24th, before 12. At the time of this last notice, she had not cleared, and passed to the disposal of the charterers, a space of 4,268 cubic feet, called the "main 'tween-decks," or cross-bunkers, claiming it was necessary for coal, which the charterers denied. She had no ballast either aboard or accessible, and could get none by her cancellation date. She had not been passed for grain, and one of her holds was wet from a leakage, so that grain could not have been put there without additional preparation. She had not coaled for the voyage. *Held,* that the charterers were justified in canceling the charter on the ground that her notice of readiness was untrue at the time it was given.

*(Syllabus by the Court.)*

Libel in Admiralty on an Alleged Breach of Charter-Party, for Damages Claimed of $6,666.57.

The charter-party which is the basis of this action contains, among others, the following clauses:

"NORFOLK, Nov. 15, 1888.

"It is this day mutually agreed between agents for owners of the British steam-ship Cambodia, of Liverpool, of 1,969 net tons register, or thereabouts, now expected passing Gibraltar to-day to New York direct, and Myers & Co., Norfolk, Va., charterers, that the said steamer, being tight, staunch, strong, &c., shall, with all convenient speed, sail and proceed in ballast to the ports of Norfolk $_{\text{or}}^{\text{and}}$ Newport News $_{\text{or}}^{\text{and}}$ West Point, Va.,—two ports only,—as ordered on arrival at Hampton Roads, and there shall load from the agents of the said charterers a full and complete cargo of cotton $_{\text{or}}^{\text{and}}$ other lawful merchandise which the charterers bind themselves to ship, and, being so loaded, shall therewith proceed direct, under steam all the way, to Liverpool, Eng-

land, as may be ordered, &c. Forty-five hundred pounds British sterling, (£4,-500.) The entire carrying capacity of the vessel, including cross-bunkers, space under bridge deck, lazarette, deck-houses, and other spaces where steamer has usually carried cargo, or would carry cargo if loaded on rates, shall be at the disposal of charterers, exclusive of any space which may be needed for the crew, cabin stores, and coal for the voyage, and owners guaranty not to occupy more space for coals below than was occupied on previous voyages from the United States to Europe, when steamer was loaded with cotton for their benefit, &c. If any grain be shipped, steamer to provide necessary shifting-boards and feeders, and to load under inspection of underwriter's surveyor, whose instructions as to stowage and draught of water are to be carried out. If no heavy cargo be shipped, and additional ballast be required, the same to be provided by the steamer. If the steamer be not sooner dispatched, seventeen (17) days, Sundays excepted, shall be allowed the charterers for loading, &c. The customs and usages of the ports of loading and discharging to be observed, unless otherwise expressed. Demurrage at the rate of sixpence per registered ton per day. It is agreed that this charter shall not commence until the morning after the steamer is ready to receive cargo at the place of loading, all of her holds being cleared and passed for grain, and customary notice thereof is given to the charterers or their agent; and such notice must be given before 12 o'clock on the day the steamer is ready, &c. Should the steamer not be ready in all respects for cargo at her first loading port for entering on this charter by December 25th, 1888, the charterers may cancel the charter," etc.

The Cambodia actually passed Gibraltar on the night of the 16th November. She arrived in New York on the morning of the 6th December, after a passage from Gibraltar of 19 days. On the 6th December, her agents in New York, Peter Wright & Sons, telegraphed the charterers, Myers & Co., in Norfolk, that she arrived that day, and would sail in about a week. On the 7th, Adam Wildgoose, master of the Cambodia, received a letter from Myers & Co. asking when they might expect the steamer there, and whether he required any dead-weight cargo to load cotton. Wildgoose replied on Monday, the 10th, saying that his vessel should be discharged about the latter end of the week, (which would be the 15th,) and that, if the ship were completely filled with cotton, she would require 100 tons of dead-weight in the after hold, independently of the water ballast. He promised to wire two or three days before he was ready to leave New York, in order that they might have time to telegraph which port the Cambodia should go to first. The Cambodia was occupied thirteen days in discharging her cargo in New York, which was four to six days longer than her master or New York agents had expected. On the 15th and 17th December the master of the Cambodia received telegrams from Myers & Co. to proceed to Newport News, if not otherwise advised, by pilot. On the 19th, Peter Wright & Sons telegraphed that the Cambodia's discharge had been prevented by rain, and she would sail about 3 o'clock that afternoon. The steamer left New York about 10 o'clock on the night of the 19th, and arrived at Newport News about 8 o'clock on the morning of the 21st. She had brought no ballast, and ballast was not readily obtainable, if obtainable at all, at Newport News. Myers & Co. lived at Norfolk, and had no office at Newport News. A telegraph was in op-

eration between Newport News and Norfolk, which are about 13 miles apart, across Hampton Roads. On arrival, Capt. Wildgoose met Myers & Co.'s stevedore at Newport News, who told him that he had orders for the steamer to be taken along-side the wharf there, pointed out the berth she was to enter, and said that Myers wanted to see him over at Norfolk. He accordingly went over to Norfolk on the 11 o'clock ferry-boat, in company with this stevedore, having employed a man to enter his ship at the custom-house at Newport News. Besides a ferry-boat running direct from Newport News, there is a steamer that passes there, bound for Norfolk via Hampton, at about 7 A. M. Capt. W. arrived at Norfolk at 12:20 P. M. on the 21st December. On seeing Myers at Norfolk, the master informed him that his ship was ready to receive cargo, except some coals in one hold, put there for ballast. Myers objected on that ground, and because of some dunnage, that the ship was not ready. A conversation ensued in which the master understood that the charterers intended to ship flour and logs for dead-weight; and the charterers inquired about logs and flour, but intended to express no present purpose to use these articles, instead of grain, as dead-weight. Nothing at all was said about ballast. In the conference the master positively refused to take logs on deck. This refusal, by requiring all logs shipped to be put in spaces available for the much more valuable article of cotton, put an end to any intention Myers might have had to ship logs. Nothing was said in that conversation about grain for dead-weight cargo, and it was not at first thought of by Myers. The refusal of the master to take logs on deck put Myers to considering about grain, and he began to telegraph, that day, inquiries for grain. Myers also instituted similar inquiries about flour. These inquiries all related to dead-weight cargo, the main cargo, intended to be shipped in all available spaces of the steamer, being cotton. The master states that Myers engaged to give him logs and flour, but the evidence shows that it is not practicable for a charterer, in a case like the one under consideration, to make up his mind, before commencing to load a ship chiefly with cotton, as to the particular kinds and quantities of cargo he will put on board, and that he is at liberty to make his choice as the loading progresses. Capt. Wildgoose returned to Newport News about 4 in the afternoon of the 21st of December, (Friday,) and set his crew to work to clear the hold of coal and dunnage, which, he testifies, was accomplished by 6 o'clock on Saturday morning, the 22d. But the log-book would seem to show that this statement of the master was true only of the coals in the bunker, and that the coal and timber in the hold No. 3 was not cleared out until 6 o'clock P. M. of the 22d. The entry in the log is:

"Saturday, Dec. 22d, 1888, at 6 A. M., coal finished; crew employed cleaning the hold, and heaving over the dunnage wood overboard. At 6 P. M. all the holds perfectly clear and clean, ready to receive cargo."

This seems to show that the ship was not clear till 6 in the evening. On Saturday, the 22d, Capt. W. went again, on the 11 o'clock ferry-boat, to Norfolk, arriving there at half past 12. He at once proceeded

to the office of Myers & Co., and handed in a letter notifying them of his readiness to receive cargo, in these words:

"S. S. CAMBODIA. NEWPORT NEWS, 22d Dec., 1888.

*Messrs. Myers & Co., Norfolk, Va.*—SIRS: Notice. I beg to inform you that the S. S. Cambodia, chartered by your firm to load a cargo of lawful merchandise for Liverpool. The vessel is now laying at Newport News, U. S., ready in every respect to receive cargo, or lay-days to count.

"ADAM WILDGOOSE, Master."

Some time after the delivery of this notice to a person in the office, Myers came in, examined the notice, and, without saying whether he accepted it or not, made remarks to the effect that the ship was not ready, as his stevedore had told him that it would take a much longer time to take up the coals from the hold. Afterwards, about half past 2, Myers handed the master a paper declining his notice of readiness, in these words:

"NORFOLK, Dec. 22d, 1888.

"*Capt. A. Wildgoose, S. S. Cambodia*—DEAR SIR: Your notice of readiness for cargo is received, but we decline to accept it; it not being given to us, as required by charter, before 12 M.

"Yours, truly, MYERS & CO."

The master returned to Newport News, on the 3 o'clock ferry-boat, on the same day. On the next day, (Sunday, the 23d,) he mailed to Myers & Co. a letter, dated on the 22d, which was received from the post-office after 12 o'clock on Monday, the 24th, in the form of that which had been delivered in person on Saturday, the 22d, giving notice of the Cambodia's readiness to receive cargo. Early on the morning of Monday, the 24th, as soon as the telegraph office opened, he telegraphed to Myers & Co. in these words:

"NEWPORT NEWS, VA., Dec. 24th, 1888.

"*To Myers & Co., Norfolk*: Herewith I give you notice that steamer Cambodia is now ready to receive cargo as per charter, or lay-days to count.

"WILDGOOSE, Master."

On the same morning, Mr. Slaughter, of the firm of Myers & Co., accompanied by their stevedore, came aboard, and went over the Cambodia for half an hour, and then went ashore. On the same morning, two men employed by the master, viz., Jere Adams, ex-master mariner, and E. Clayton, ex-master mariner, examined the ship, and gave the master a certificate stating that they had that day "repaired on board the Cambodia, and held survey on the condition of hold, and found it in a clean and dry condition, fit for stowage of any kind of cargo." The evidence shows that the floor of hold No. 3, where dead-weight cargo would be stored, was wet from leakage, and that five or six days afterwards, when the ship was about to take on grain under another charter, this hold had to be ceiled and otherwise made ready, by work consuming two or three days, before the underwriter's inspector would pass it for grain. The weight of testimony is to the effect that grain could not have been stored there with safety on the 24th December. Mr. Slaughter, of Myers &

Co., returned to the ship in the course of the morning of the 24th, and handed Capt. Wildgoose a letter in these words:

"NORFOLK, VA., Dec. 22d, 1888.

"*Capt. Adam Wildgoose, Master S. S. Cambodia, Newport News, Va.*— DEAR SIR: Referring to the statement in your notice dated Dec. 22, of readiness for cargo, wherein you state your vessel is now ready in every respect to receive cargo, which notice we have declined to receive to-day, it not being given prior to 12 o'clock, as required by charter, we now beg to say that, upon examination of your vessel, we find that she is not in every respect ready to receive cargo, for the following reasons: *First*, as stated by yourself, she requires 100 tons of ballast in her after hold in order to enable us to load her full of cotton; *second*, she has not discharged the coal out of her main 'tween-decks from the space indicated on the scale of your ship as containing 4,268 cubic feet, which space the scale shows to be included in the cargo capacity of the holds; *third*, she has not been coaled for the voyage for which she is chartered, and is not, therefore, ready in every respect to load and proceed direct to her destination. As these are prerequisites, under the law and custom of the port, and charter, to give the notice, we cannot deem any notice valid without them. We are,

"Yours, truly,                                   MYERS & CO."

The principal of the objections, thus set out, to the master's notice of readiness, was the one referring to the fact that a space between decks, marked as "main 'tween-decks," about midships on the plan of the ship filed in the evidence, and as having a capacity of 4,268 cubic feet, had not been cleared of coal, and made ready for cargo. During his visit to the ship on the morning of the 24th, at Newport News, Mr. Slaughter had demanded stone ballast to be put on. This the master learned that he could not get short of Baltimore, and offered to furnish coal ballast. Mr. Slaughter objected to coal as injurious to cotton, and insisted on stone ballast. On the 25th the master received the following letter:

"NORFOLK, VA., Dec. 25th, 1888.

"*Capt. Adam Wildgoose, S. S. Cambodia, Newport News, Va.*—DEAR SIR: Referring to our letter of the 22d inst., we beg to notify you that, in consequence of your steamer not being ready for cargo in the several respects mentioned therein, we hereby cancel the charter. We are,

"Truly, yours,                                   MYERS & CO."

The original charter having been canceled on the 25th December, the Cambodia was chartered to Myers & Co. a second time on the 28th day of the same month, subject to a special agreement in these words:

"DEC. 28th, 1888.

"*Messrs. Peter Wright & Sons, Agents of S. S. Cambodia, New York, N. Y.* —DEAR SIRS: In chartering steamer Cambodia from you, as owners' agents, on this date, we agree that it is understood between us that it will not in any way prejudice the rights of either owners of said steamer or their agents or ourselves in any legal steps they may elect to take against us by having canceled charter-party dated November 15th, 1888, between us and this said steamer. We are,

"Truly yours,                                   MYERS & CO."

"We agree that the above is our understanding also.

"PETER WRIGHT & SONS, Acting for Owners."

The ship was loaded under the second chartering, and proceeded duly to Liverpool. After completing her loading at Norfolk, she grounded on her way to the coal-pier at Lambert's Point. She sailed with 489 tons of coal on board, and had on hand, when she arrived, 68 tons, having consumed 421 tons on the voyage. She left Lambert's Point on the 12th, and reached Liverpool on the 29th, January, 1889, making the trip in 17 days. Under the second chartering, Myers & Co. claimed the main between-decks alluded to above, for cargo, but relinquished it on the steamer's agent allowing certain other spaces for cargo, not usually used or allowed for that purpose; and the ship used the main between-decks for coal. On previous voyages the ship had carried as much as 100 tons of coal on her main deck, when chartered on rates.

In his elaborate examination, Mr. Myers, one of the respondents, stated on the witness stand, in substance, as follows: He had expected the Cambodia in Hampton Roads by the 10th or 12th of December; assuming that she passed Gibraltar on the 15th November, that she would reach New York in 17 days, or by the 3d December, and that she would be occupied 8 days there in discharging her cargo, he accordingly engaged cargo for her to leave Newport News about the 15th, and Norfolk about the 20th, December. Her non-arrival had made it necessary for him to forward the larger portion of the cargo thus engaged by four other steamers, including 4,939 bales of cotton billed from points in the interior; three of the four steamers taking the cargo being chartered by his competitors in business. He had negotiated for the Cambodia with her agents, Culliford, Clark & Co., in Liverpool. With a view to forcing, as much as might be, an early arrival of the steamer, he had named the 20th December as the day of cancellation; but, after the agents had informed him, and inserted in the charter-party, that she was expected passing Gibraltar on the 15th, the cancellation day ceased to be of importance, and he made it the 25th. He stated that coaling before loading was important, for several reasons, viz.: Loading, of course, deepens the draught of the ship 6 to 8 or 10 feet. The depth of water about the coaling pier at Lambert's Point is 20 to 23 feet, and less at low tide. Vessels sometimes get aground in going there, and sometimes while there. They sometimes have to change at the pier from one hatch to another. If they are aground, they must wait for a tide to shift. Shippers frequently engage to sail within a month, or by a certain day in a month. It is important for a vessel to coal before loading, in order that these delays incident to coaling may be avoided. In respect to cattle, insurance companies will not take risks unless the ship is coaled before they are put on board. Besides, when the coal is on board and placed, the charterer knows definitely all the spaces available for cargo, and cannot know satisfactorily before; especially as to cotton, which, being exceptionally bulky and valuable, requires all the space that can possibly be obtained. He stated that shippers cannot decide how, or with what, they will load a ship, until they know her build and spaces, and sometimes until they have put in the greater part of the cargo. Especially is this so with cotton. Each bale represents a freight of about $2.50. It has to be

packed tight, and jammed in with screws. If loaded injudiciously, much space is lost. Suppose one or more floorings or layers of bales leave a space under the deck above of two feet. The height required for each each layer is two feet nine inches; and thus the room for an entire layer of bales in that hold, and possibly in the whole ship, is lost, to be filled with cotton irregularly stored, or by other kinds of cargo. By judicious loading this state of things may be avoided. For these reasons, when a ship, never loaded in this port before, comes here to be furnished with cargo, he states that it is the habit of his firm to ask for a plan of her, and, with his stevedore, to carefully calculate where cotton and other cargo may be put in her to best advantage. He carefully preserves the plans of all ships that have been loaded here, in order that negotiations for chartering them may be intelligently made, when they come again. A plan of the Cambodia is filed in the evidence of Capt. Wildgoose. It shows two classes of spaces,—one class for coal, and the other for cargo. It shows under-decks bunkers for coal having capacity for 192 tons, and between-decks bunkers with capacity for 182 tons, making an aggregate capacity for 374 tons of coal. It shows spaces for cargo having an aggregate capacity of 5,105 tons, of 40 cubic feet per ton, or of 204,200 cubic feet, made up as follows:

| | |
|---|---|
| Hold No. 1, | 38,617 feet. |
| Hold No. 2, | 36,727 feet. |
| Hold No. 3, | 60,592 feet. |
| After between-decks, | 27,369 feet. |
| Fore between-decks, | 24,737 feet. |
| No. 3 hold between-decks, | 11,880 feet. |
| Main between-decks, | 4,268 feet. |

This plan designates for cargo the main between-decks space of 4,268 feet, above enumerated. Allowing 22 cubic feet for each bale, it affords storage for 194 bales of cotton, and represents a freight value, at $2.50 a bale, of $495. When Myers & Co. learned, or Mr. Slaughter saw, on the 24th December, that this main between-decks space was not cleared of coal, and that the master had no intention of allowing it to be used for cargo, they were confirmed in their purpose of canceling the charter-party, which was done on the 25th. It is shown in the evidence in the case that, whatever stipulations may be inserted in charter-parties entered into at this port on the subject of the time of coaling, it is not the habit of shippers here to require the coaling of the steamer before loading.

*J. Sydney Biddle, A. R. Hanckel*, and *Harmanson & Heath*, for libelant.
*Sharp & Hughes*, for respondents.

HUGHES, J., (*after stating the facts as above.*) The foregoing statement embraces the controlling facts of the case under consideration, drawn from a great mass of evidence on file. The question of the case is whether the libelants, *stricti juris*, had on the 24th December, 1888, complied with the requirements of the charter-party, as to readiness to receive cargo, and whether the respondents had a technical right to cancel that instrument. I say *stricti juris*, because, although courts of admiralty, as courts of

equity, are in general reluctant to enforce forfeitures, or to justify recourse to rights merely technical, yet it is proper, and they are ready to do so, where the very right of the case is subserved by such action, and where the facts do not fall within the reason of the maxim, *ut res magis valeat quam pereat*. In the case at bar, although the libelant lost by cancellation the benefit of the first charter-party, yet his ship, after a few days, was rechartered by the libelants, and made a prosperous voyage to her home port. The profit from the second charter-party was probably not as great as would have been derived from the first, but the difference was only pecuniary. The ship did not have to go home in ballast, and no serious loss or grievous disaster occurred to the libelant. The case was one of greater hardship to the respondents, attended by more or less loss and mortification in business, resulting from disappointment from the unexpectedly tardy movement and late arrival of the ship. The ship passed Gibraltar more than 24 hours later than was expected. Her voyage thence to New York was as much as a day longer than was expected, and she consumed five days more in discharging in New York than either her master or her New York consignees expressly indicated that she would consume. So that, instead of arriving in Hampton Roads by the 12th December, in time to load before the Christmas holidays, she did not arrive until the 21st, and then was not in condition to give notice of readiness to load until the 24th December, the eve of Christmas. The proof is that rates of freight do, and did then, take a serious fall at Christmas; and even a small decline in rates makes all the difference between profit and loss on charter-party contracts in which, as in the ports of Hampton Roads, the margins of profit are very small. If, therefore, the very right of the case in this controversy seems to justify a strict and technical construction of the charter-party, there is nothing in the policy of admiralty or equity courts to forbid the application of it.

That the margin of profit to the charterers was very small under the first charter-party is shown by some of the facts exhibited in the evidence. The ship was chartered for the lump sum of £4,500, or about $22,000. It was chartered primarily for cotton, in the midst of the cotton exporting season, when that article pays a higher freight to the charterer than any other article of export. The charter-party provides for a full and complete cargo of cotton or other merchandise, at the discretion of the charterers; so that, if a full and complete cargo of cotton could be put on the steamer, it was to be presumed that the cargo would in fact be, as nearly as practicable, all cotton. The capacity of this ship for cargo, as shown by the plan of her furnished to the charterers, including the main between-decks cross-bunkers, was 204,200 cubic feet. If every foot of these cargo spaces were of such form and dimensions as to admit of being filled with cotton, the charterers might have put on board 9,281 bales, allowing 22 cubic feet as the dimensions of the compressed bale. From the spaces thus computed must, however, be deducted the displacement necessary to making room for 100 tons of ballast, equivalent in dimensions to 181 bales of cotton. This gives 9,100 bales as the utmost number stowable in all the spaces of this ship

marked as for cargo on the plan that has been mentioned. But, the form of cotton bales being fixed and unchangeable, there is more or less waste of space in stowing them on board; this waste being sometimes very considerable. I judge that in the seven different compartments of the Cambodia, three of them comparatively small, the loss of stowing capacity for cotton bales, on the whole ship, would hardly be less than for 350 bales, and that the most skillful stevedore could hardly store more than 8,750 bales in the spaces marked for cargo on the plan of the ship. The proofs in this case show that $2.50 per bale represents the average freight on cotton from Norfolk to Liverpool. Therefore, if Myer, & Co. could have used all the spaces marked for cargo on the Cambodias they would have received on the shipment, at the average of $2.50 per bale for 8,750 bales, the sum of $21,875, and would have realized from their contract about the price, which they stipulated to pay for the ship. When, therefore, on the 24th December, Mr. Slaughter found that the main between-decks cross-bunkers of the Cambodia were not cleared for cargo, and learned that the master positively insisted upon using that space for coal, it was not surprising that his firm finally determined to cancel the charter-party. This space was of capacity for stowing 196 bales of cotton, representing $485 of freight money, which sum is hardly more than the margin of profit on which large ships are chartered in the cotton season, in this port, for Liverpool. If the Cambodia had arrived by the 12th December, and the occurrences from the period from December 21st to 24th had happened in the few days following the 12th, the hardship upon Myers & Co., of depriving them of the disputed cross-bunkers, would have not been so great, because, in the comparative buoyancy of freight rates, they might have found some way of compensating themselves for the loss of so much cargo space. Arriving, however, as the ship did, at a period of depression in freight rates, after unexpected delays, it was not unreasonable in Myers & Co. to expect the master to do as the evidence shows that he had done on previous voyages, and, by putting 100 tons of coal on deck, yielded the space in dispute to the charterers for cotton. The master, however, does not seem to have been of a temper to yield his own views to such considerations of deference to the interest of his charterers. Being of opinion, from what has been said, that the equities of the case at bar were on the side of the respondents, I feel at liberty to place a technical construction upon several provisions of the charter-party under consideration.

And first as to the clause defining the space for cargo which should be at the charterers' disposal: On this head the only question is whether the charterers were entitled to the main between-decks cross-bunkers marked as for cargo, with capacity of 4,268 cubic feet, upon the plan of the ship. This plan or paper is not part of the charter-party, and cannot be taken to affect or modify its provisions. It is merely a representation of the ship and its several parts. Its only value is to enable us to understand more clearly than we could do without it the provision of the charter-party, defining the spaces to be used by charterers. This instrument gave the charterers a right to "the entire carrying capacity

of the vessel, including cross-bunkers  *  *  *  and other spaces where steamer has usually carried cargo, or would carry cargo if loaded on rates," exclusive of space needed for coal, etc., the owners guarantying "not to occupy more space for coals below decks than was occupied on previous voyages from the United States to Europe when loaded with cotton for [owners'] benefit." The last clause of this provision, though showing the intention of the parties, was not specifically applicable to the Cambodia, which had made no such voyage with cotton. But it is proved, that the Cambodia had crossed the Atlantic in voyages on which she had started out with 100 tons of coal on deck. It is proved that she made a voyage under the second chartering, in January following the cancellation of the first contract, from Norfolk to Liverpool, with 489 tons of coal taken on here, and had 68 tons left on her arrival at Liverpool, having consumed 421 tons. The plan of the ship shows that her bunkers below deck, marked for coal, carry 374 tons. Certainly, therefore, with these coal bunkers filled, and 100 tons more on deck, making 474, only 7 tons less than she took on at Norfolk under the second chartering, the main between-decks cross-bunkers, which her master refused for cotton, were not "needed" for coal. So that the question simply is whether the contract, in its spirit and intention, and its use of the term "needed," justified Capt. Wildgoose in insisting upon putting coal in the disputed cross-bunkers to an amount which he had before, on occasions, carried on deck. I think it did not justify him, and that the charterers were entitled to the main between-decks cross-bunkers.

As to the provision relating to ballast: The charter-party gave the charterers an option to ship grain or heavy cargo, at their discretion, and provided that if heavy cargo was not shipped, and ballast should be required, the ballast should be provided by the steamer. There is no provision of the contract which requires the charterers to notify the master, in advance of loading, of the particular kinds and quantities of cargo they would put on board. This matter is governed by the custom of the port; and according to this custom, and independently of custom, the option of the charterers as to how the cargo should be made up continues during the whole period of loading, which, if this ship had been loaded, might have lasted 17 days, exclusive of Sundays. The fact that this continuing option existed made it incumbent upon the master to have ballast on board at the time he gave notice of readiness to receive cargo, or readily at hand to be taken on board, if the charterer would so require, before loading was completed. In point of fact, the Cambodia brought no ballast from New York; and her master admits, in evidence, that he could not procure it in Newport News, or anywhere short of Baltimore. The ship, therefore, if she had been loaded by the charterers without dead-weight cargo, as they had a right to do, would not have been in condition to comply with her stipulation in the charter-party to proceed direct to Liverpool on being loaded. Capt. Wildgoose sought to excuse his neglect in providing ballast by contending that the telegram of 6th December, received from Myers & Co. while he was in New York, asking whether he required dead-weight cargo to load cotton,

was a notification to him that the charterers would supply dead-weight cargo.    This is an untenable position.    If mere inquiries for information were equivalent to stipulations, all commercial negotiations would come to an end.    The master furthermore insisted that in his conversation with Myers in Norfolk, on the 21st, the latter engaged to furnish flour and logs for dead-weight.    It is hardly credible that Myers, with an option, which would last for 17 days, to load entirely with cotton, or to substitute 100 tons of dead-weight cargo in part, would, before he had studied the plan of the ship then handed him, and before notice of her readiness to receive cargo, cut himself off from control in the matter by agreeing to furnish flour, which he did not have, or logs, which, as to most of those shipped from Norfolk and Newport News, are too light for dead-weight.    The weight of proof, and the probabilities of the case, negative this claim of the master.    The duty was upon the ship of having ballast on board, or immediately at hand, under an express stipulation of the charter-party; and the master was bound by this provision to be provided with ballast before giving notice of readiness to receive cargo, notwithstanding any inferences he might have drawn individually, from the inquiring telegram or the interrogating conversation.    The notice of readiness given on the 24th was not valid or binding on the charterers, for the reason that the ship was not provided with ballast, and could not have sailed direct for Liverpool without it.

The state of things is similar in regard to the provisions of the charter-party that, "if any grain be shipped, it is to be loaded under inspection of underwriter's surveyor," and that, when notice is given of the steamer's readiness for cargo, "all of her holds shall have been cleared, and passed for grain."   The proofs show that when notice was given, on the 24th December, there was more or less water in hold No. 3,—the most capacious part of the ship,—and that within the same week, when grain was to be put aboard under the second chartering, the underwriter's surveyor required ceiling to be done, and boards and timbers put in, which work required about three days for accomplishment.    The certificate of the two ex-mariners, Clayton and Adams, given some time on the 24th December, that "the ship was fit for the stowage of any kind of cargo," even if it had been in time, and even if the ex-mariners had been officers competent and authorized to "pass the ship for grain," was in point of fact untrue, and therefore worthless.    It is not usual or safe to ship grain in a hold wet, from a blind leakage, without ceiling, and without protection by proper timbers.    True, if, in the period of 17 lay-days during which the loading of the ship was proceeding, the charterers had found it to their interest to ship grain, then, in such event, these preparations might have been made; but the charter-party required, expressly, that the ship should be in condition to receive grain at the time of the notice.    Certainly, this provision of the contract was not fulfilled by the ship.

I must rule in a like manner in respect to coaling.    The ship had not been coaled for the voyage on the 24th December.    If loaded before coaling, instead of proceeding direct for Liverpool as required by an express stipulation, she would have had to proceed to Lambert's Point or New-

port News for coal, and then on her principal voyage. If such a divergence had been intended by the contracting parties, it would have been expressed. The custom of the port cannot enter into and change so material a part of the contract. Without coal on board, the ship was not ready to proceed, on receiving cargo, direct to her destination. Mr. Justice LOPES, of the admiralty appeals court of England, in the case of *Groves* v. *Volkart*, 1 Cab. & E. 309, a case tried by him in a suit at common law, laid down the law, generally, in regard to a ship's readiness to receive cargo, as follows:

" A ship, to be ready to load, must be completely ready in all her holds,—must be discharged in all her holds,—so as to afford the merchant complete control of every portion of the ship available for cargo. The merchant can then stow his cargo as he thinks most advantageous. In no other circumstances can a ship, by which I understand must be meant an entire ship, be placed at the disposal of a merchant. If any other construction is placed on the words ' ready to load,' it is obvious that great inconvenience would arise. It might be contended that a ship was ready to load when one hold only was empty, and a merchant might not have the rest of the ship placed at his disposal for an indefinite period. I doubt not but that the defendants were anxious, and schemed to be able, to cancel this charter-party; but still I am bound to give effect to what I believe to be its true meaning. A custom was set up by the plaintiffs to load and unload simultaneously, but it was not proved,—in fact, was disproved." Id.

Coal was obtainable by the Cambodia only at Lambert's Point, three miles, or Newport News, thirteen miles, from Norfolk, where she was to complete her cargo. *Non constat* but that she might have got aground on her way to Lambert's Point, as she did after loading under her second chartering, or have grounded at the pier in shifting her hatches. Delay from this cause was not only possible, but both probable and not unusual; and the master had no right to impose the risk of such delay upon the charterers, after having consumed seven or eight days more time in reaching Hampton Roads from Gibraltar than had been expected; most of the delay having occurred at her wharf in New York, from rainy weather. Whether unavoidable or not, the master had not succeeded in getting to Hampton Roads from Gibraltar with that alacrity described as the "life" of commerce by Mr. Justice SWAYNE, in *Lowber* v. *Bangs*, 2 Wall. 728, where he said:

"Promptitude in the fulfilment of engagements is the life of commercial success. The state of the market at home and abroad, the solvency of houses, the rates of exchange and of freight, and various other circumstances which go to control the issues of profit or loss, render it more important in the enterprises of the trader than in any other business. The result of a voyage may depend upon the day the vessel arrives at her port of destination, and the time of her arrival may be controlled by the day of her departure from the port whence she sailed. We cannot forget these considerations in our search for the meaning of this contract."

If this was a struggle between the master and the charterers as to which should bear the loss of the delay incident to Christmas week, surely the equities were with the charterers; and these were not required, by considerations of mercantile good faith, to subject themselves to the

risk of the further delays that might attend the Cambodia in the process of coaling, after their disappointing experience with that ship from the tardiness of her arrival at Hampton Roads.

As to the times at which the notices of readiness to load were given by the master, it is hardly necessary for me to say anything. Clearly, the notice of the 22d December, given after 12 o'clock, was invalid. I am inclined to think, however, that the telegraphic notice given on the morning of the 24th, received before 12 M., was in time, and would have been valid if the vessel had in fact been ready for cargo. Clearly, the letter written Sunday, the 23d, and not received until after 12 M. Monday, was not in time. These questions of time of notice, however, are, in the case at bar, altogether immaterial. The ship was never ready to receive cargo. She had not the requisite 100 tons of ballast either on board or at hand. Even if she had the option to use coal as ballast, she had not that quantity of coal placed aft in the No. 3 deck. Nor was she on the 24th coaled for the voyage to Liverpool, and could not have proceeded thence direct after receiving her cargo. Moreover, she had coal in the main between-decks cross-bunkers, which was, therefore, not cleared for cargo, etc., and to which, according to the terms and spirit of the charter-party, the charterers had a right for cotton. On the whole case, I will sign a decree dismissing the libel, with costs.